STATE OF MAINE
CUMBERLAND, SS.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-PORSC-13-326

RILEY WOODWORKS LLC )
)
    Plaintiff and Counterclaim )
    Defendant, )
)
    v. )
)
CHRISTOPHER BOND, SEBEGO LAKE, )
ROWING AND SAILING CLUB, LLC, )
)
    Defendants and Counterclaim )
    Plaintiffs )
)

JUDGMENT

STATE OF MAINE
Cumberland. ss. Clerk's Office
MAR 08 2016
RECEIVED

This matter came before the court during the course of a jury-waived trial. The parties filed post-trial briefs on January 26, 2016. The court has carefully considered the evidence presented by the parties and adjudges as follows.

## I.    FACTS

The parties' dispute involves competing allegations of a breach of contract. The parties consummated two contracts.[1] One contract involved the promise by Plaintiff to perform certain renovations, improvements and alterations to a structure owned by Defendants Bond and Sebago Rowing, located in Standish, Maine. During the trial, this property was commonly referred to by the parties as the "Sebago Project." The second contract involved renovation work to be performed on a condominium owned by Christopher Bond, located in South Portland, Maine and to which the parties have referred as the "Harborplace Project." For purposes of analytical clarity, the court examines the two contracts in chronological succession.

---

[1] Mr. Bond contends that these contracts should be considered a single contract. There was nothing in the record to support such a conclusion. The two projects involved distinctly different properties and involved equally different contractual agreements.

Riley submitted several iterations of estimates, outlining time and material to complete certain renovations on the Sebago property. Riley estimated the Sebago cost at $26,781.19; the sum of labor ($16,327) and materials ($10,454.19). Riley and Bond signed the Sebago contract on November 28, 2012. Bond inserted the total estimate figure in handwriting on the contract and scribbled through the provision that reduced the figure into separate estimated time and materials. Bond also attempted to delete the merger clause and attached the revised estimate as part of the contract, which itself reflected the estimated time and materials.

The Sebago project involved an older building that was in exceptionally poor repair. Riley testified that this is precisely the type of project that requires a baseline estimate but that often involve unforeseen difficulties, such that require the scope of work to change. Such was in fact the case with the Sebago property. Riley disclosed to Bond the issues presented by the old structure, such as rotted floor joists and subfloor and outdated electrical systems. Bond agreed to have Riley address those issues with the attendant increased cost to do so. Riley continued the work on the Sebago project.

In January 2012, Bond asked Riley to renovate Harborplace. Riley and Bond signed the contract, which consisted of a host of handwritten estimates. Bond placed some urgency on the Harborplace project and as such, asked Riley to make it a priority. As with the Sebago project, Bond requested a number of changes and extras to the Harborplace project that delayed its completion.

Riley had substantially completed the work to Harborplace by March 27, 2013. Riley requested final payment of $6,674, plus payment for the extra work he performed. Bond conceded at trial that he owed Riley this sum, but refused payment because the remaining extra work required an additional day to complete. This refusal was the catalyst, along with a general

2

pastiche of conflicting personality types, to Bond's letter of March 28, 2013 to Riley, instructing Riley to stop work on both projects. Riley complied, leaving both job sites. A final demand from Riley to Bond for payment related to the Sebago project was memorialized in a letter dated May 23 2013. Bond refused payment of any kind, nature and amount for both projects. Riley recorded liens on both properties and this action ensued.

The material facts were not generally in dispute and are not particularly complex, despite the parties' consuming efforts to characterize these facts. This is not entirely unique in such small construction contract disputes, but perhaps more overwrought here than typically is the case.

Plaintiff's Exhibits 15-17 support actual costs of the Sebago and Harborplace projects, including the amount paid by Bond. Riley testified and the court finds that the labor costs were reasonable, necessary and customary. Mr. Bond did not at trial dispute the labor costs related to Harborplace. As for Sebago, Mr. Bond challenges those labor costs that exceeded the estimated cost pointing out for what evidentiary value it has, that Mr. Bond did not memorialize the labor increases. The labor costs in dispute are for demolition, foundation, roofing, electrical, plumbing and painting. The tally of these above-estimate costs is $8,908.00. Mr. Bond disputes these costs as being presented through a final invoice after the unhappy dissolution of the business relationship between the parties. As such, Mr. Bond urges the court to discredit the accuracy of these costs as reflecting nothing more than inflated charges that were motivated by Mr. Riley's anger toward Mr. Bond. The court declines to adopt that characterization and finds the above-estimated costs for work actually performed by Mr. Riley to be supported by the balance of the record, to include Plaintiff's Exhibit 15 and testimony by Mr. Riley and supporting time cards.

3

Defendants assert counterclaims for breach of contract in the form of faulty workmanship and untimely completion, violations of the Home Construction Contract Act, and Unfair Trade Practices Act.

## II.   Conclusions

In order to prevail on the contract claims, the parties must prove (1) breach of a material contract term; (2) causation; and (3) damages. *See Me. Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, P 7, 724 A.2d 1248. A material breach of contract "is a non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." *Jenkins, Inc. v. Walsh Bros., Inc.*, 2001 ME 98, P 13, 776 A.2d 1229, 1234 (quotation marks omitted); *see also Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, P 9, 760 A.2d 1041, 1044 (stating that "whether a breach has occurred . . . [is a] question[] of fact").

The ineluctable conclusion is that Mr. Bond's failure to pay any amount toward the Harborplace invoice constituted a material breach of contract. Mr. Bond's argument that he did not yet owe the balance because work remained at Harborplace, estimated to have constituted one day, is of no moment to the legal analysis. Riley's testimony that all contractual work was completed is credible and that whatever "extra" work remained should not have formed the basis for Mr. Bond to fail to pay any amount whatever.

Mr. Bond's demand that Riley stop work on both jobs on March 28, 2013 (Plaintiff's Exh. 12) constituted a material breach of the Sebago contract, insofar as that did not absolve Mr. Bond from the outstanding amounts owed on the contract and was merely a reaction to Riley's March 27 demand for payment on the projects. There was no evidence that Riley abandoned the

4

job. To the contrary, the evidence supports the conclusion that Mr. Bond's stop-work demand was honored by Riley.

Mr. Bond's claims for breach of contract come in two forms; to wit, that Riley failed to complete the work on Sebago by the date in the contract, and that Riley's workmanship was faulty. As for the second claim for shoddy workmanship fails simply because there was no admissible evidence supported by expert testimony, or otherwise, that Riley's work failed to meet a particular building practice standard. Moreover, "[w]hether time is of the essence in a contract is a matter of fact[.]" *Raisin Mem'l Trust v. Casey*, 2008 ME 63, P 21, 945 A.2d 1211. The absence or presence of "time is of the essence" language is not dispositive and courts consider the "nature, circumstances, and purpose of the contract to determine whether time is of the essence." *Id.*; *see W.G. Ambrose Enters, v. Keefe*, 2009 Me. Super. LEXIS 136, at *7 (Sept. 23, 2009); *see Frost v. Barrett*, 246 A.2d 198, 201 (Me. 1968). Moreover, "a rule of reasonableness is appropriate." 14 Powell on Real Property § 81.03(5) (2005); *see Me. Mut. Fire Ins. Co. v. Watson*, 532 A.2d 686, 689 (Me. 1987) ("When no time for performance is specified in the contract, a 'reasonable time' is implied.").

The Sebago contract did not contain "time is of the essence" language, and nothing in the record supports a different conclusion by the court based on the nature, circumstances and purpose of the contract. Given the unforeseen circumstances that attend these types of renovations, and that did in fact attend the Sebago project, the time taken to perform the work at the Sebago project by Riley was reasonable under the circumstances and did not constitute a breach, much less a material breach of contract.

Mr. Bond presents counterclaims for violations of the Home Construction Contract Act and Unfair Trade Practices Act. Both claims fail. The subject properties were commercial

5

properties and therefore do not fall within the scope of the HCCA. Because violation of the HCCA is the predicate upon which the claim for UTPA rests, the latter claim fails by extension.

Riley's damages proximately caused by Defendants' failure to pay are consistent with Plaintiff's Exhibits 15-17. As such the court awards Plaintiff damages in the amount of $18,753.69. The remaining question is whether the court should impose penalties and costs in keeping with the Prompt Payment Act.

The prompt payment statute, 10 M.R.S. §§ 1111-1120, imposes penalties against owners, as well as contractors, who do not make payments in a timely fashion. These statutory penalties act as "disincentives to withholding amounts due," and are "intended to augment damages that are traditionally available for contract or *quantum meruit* claims."

A finding that an owner breached a construction contract does not necessarily entitle a contractor to the remedies provided by the prompt payment statute. *See Jenkins*, 2001 ME 98, P 31, 776 A.2d at 1239. Instead, the availability of prompt payment remedies depends upon whether payment has been "wrongfully withheld." See 10 M.R.S. § 1118(3). Guiding this determination is 10 M.R.S. § 1113, which sets forth several principles governing the payment obligations between owners and contractors. First, payment must be made "strictly in accordance with the terms of the construction contract." 10 M.R.S. § 1113(1). Second, "the contractor may invoice the owner for progress payments at the end of the billing period," provided that the parties' contract does not include a provision governing the terms of payment. 10 M.R.S. § 1113(2). Finally, except as otherwise agreed, payment is "due from the owner 20 days after the end of the billing period or 20 days after delivery of the invoice, whichever is later." 10 M.R.S. § 1113(3). Unless an owner has a valid excuse for nonpayment, see 10 M.R.S.

6

§ 1118(1), (3), payments not rendered within this time frame are considered wrongfully withheld.

If payment has been wrongfully withheld, available remedies include prejudgment interest, a one percent monthly penalty on amounts wrongfully withheld, and attorney fees. *See* 10 M.R.S. §§ 1113(4), 1118(2), 1118(4). Regarding interest, if an owner fails to pay within the time period specified by section 1113(3), "the owner shall pay the contractor interest on any unpaid balance due beginning on the 21st day, at an interest rate equal to that specified in Title 14, section 1602-C." 10 M.R.S. § 1113(4). With regard to penalties, the amount to be awarded is "equal to 1% per month of all sums for which payment has wrongfully been withheld." 10 M.R.S. § 1118(2). In order to properly calculate interest and penalties, reference must be made "to the specific amounts owed and the dates by which they should have been paid." *Jenkins*, 2001 ME 98, P 27, 776 A.2d at 1238.

The court concludes that Defendants wrongfully withheld a portion of the sums reflected on the final invoice for Harborplace ($8,062.71) and Sebago ($10,690.98). Defendants' failure to pay for the remaining day of labor on Harborplace reflected the amount of work not yet performed. The court finds that amount to be $300. Likewise, Defendants' failure to pay $3,340 in labor increases on the Sebago property did not violate the Prompt Pay Act because Plaintiff did not provide any supports for that amount until some point during the discovery period.

The court awards to Plaintiff the following:

1. The final payment for work performed at Harborplace, less the one day of labor left to complete the project when Defendants terminated the contract, which is $8,062.71 - $300 = **$7,732.71**, plus interest to accrue beginning on April 20, 2013 at an interest rate

equal to that specified in Title 14, section 1602-C, plus a penalty of interest of 1% per month, plus reasonable attorneys fees and court costs.

2. The final payment for work performed at Sebago, which is **$10,690.98.** However, for purposes of calculating interest, penalties and fees under the Prompt Pay Act, Plaintiff is awarded interest, penalties and attorneys fees based on the foregoing sum less the $3,340 in labor increases which formed a reasonable claim or defense by Defendants[2], which is 7,350.98. As to this net sum, statutory interest to accrue beginning on June 12, 2013 at an interest rate equal to that specified in Title 14, section 1602-C, plus a penalty of interest of 1% per month, plus reasonable attorneys fees and court costs.

3. Plaintiff's counsel shall file with the court a detailed attorneys fees affidavit within 14 days from the date of this Order. Defendants may file an opposition to Plaintiff's request for attorneys fees within 7 days from the filing of Plaintiff's affidavit.

The Clerk is directed to enter this Order on the civil docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Date: March 3, 2016

Lance E. Walker
Justice, Superior Court

---

[2] The court ultimately has found that the evidence at trial supported this labor cost invoiced by Plaintiff. Such a finding does not preclude the court's finding that the labor cost, at the time, formed a basis for Defendants to withhold that sum.

8